J-A11001-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| EDWARD ALEXANDER MCCREATH SR. | : | |
| | : | |
| Appellant | : | No. 1581 MDA 2025 |
| | : | |

Appeal from the Judgment of Sentence Entered October 23, 2025
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0003694-2020

BEFORE:  BECK, J., NEUMAN, J., and BENDER, P.J.E.

MEMORANDUM BY BECK, J.:                    **FILED: JULY 14, 2026**

Edward A. McCreath, Sr. ("McCreath") appeals from the judgment of sentence entered by the Dauphin County Court of Common Pleas ("trial court"), following his convictions of delivery of a controlled substance resulting in the death of another ("DDRD"), criminal use of a communication facility, and delivery of a controlled substance.[1]  McCreath argues the evidence was insufficient to support his DDRD and delivery of a controlled substance convictions.  Upon review, we affirm.

After midnight on July 5, 2019, Nathan Maurer ("Maurer") was found dead of an apparent overdose in the driver's seat of his work truck outside the Hershey Lodge, approximately eight hours after his shift ended.  N.T.,

---

[1]  18 Pa.C.S. §§ 2506(a), 7512(a); 35 P.S. § 780-113(a)(30).

8/26/2025, at 15, 19-21. Police searched the vehicle and discovered a cell phone and a blue wax-paper bag. *Id.* at 31-32, 35. Toxicology reports revealed that Maurer had fentanyl in his system and his cause of death was acute fentanyl toxicity. *Id.* at 49, 73-75.

The police recovered his cell phone and analyzed it to determine a timeline and map of locations leading up to Maurer's death. *Id.* at 118, 120-21. His text message history revealed that Maurer conversed with individuals regarding the sale of "whites," and it was one of those individuals who shared the phone number, (717-943-**** (the "943 number")) belonging to "Slim," that Maurer could contact to purchase "blues."[2] *Id.* at 173-74. The cell phone showed Maurer engaging in conversations with 717-710-**** (the "710 number"), saved as "Slim E," regarding drug transactions for "blues." *Id.* at 123. There was another number saved as "Slim" with a pill emoji (717-884-**** (the "884 number")). *Id.* at 124. Mauer had text exchanges with these phone numbers between early February 2019 and July 4, 2019. *Id.*

The 710 number sent messages to Maurer instructing him to send payments to a Cash App account, which was linked to a First National Bank account. *Id.* at 140-41. The Cash App account ("easystreet247") and bank account were linked to McCreath's social security number and the 884 and

---

[2] Pills are generally named and sold by color and "blues" are the street term for thirty milligrams of oxycodone. N.T., 8/26/2025, at 109, 111. However, most of the pills now contain fentanyl rather than oxycodone. *Id.* at 109.

943 phone numbers. *Id.* at 132, 134, 136-39, 151-52. The Cash App records also revealed the additional Cash App account ("easysteet248") associated with McCreath, the 710 number and a physical address in Middletown, Pennsylvania. *Id.* at 138-39. Easystreet248 and the Middletown address associated with the Cash App account were referenced in past drug-transaction-related text message conversations between Maurer and the 710 number. *Id.* at 149. That address was also listed in connection with a 2018 incident with the police, McCreath, and Jazmyn Cook ("Cook").[3] *Id.* Further, the First National Bank account was linked to an address in Harrisburg, which was the same address used as a meeting place in text messages between Maurer and the 710 number on May 25, 2019. *Id.* at 150.

On May 26, 2019, Maurer texted the 710 number and asked if he "got any left?" *Id.* at 141. The response informed Maurer to go to the Sheetz in Camp Hill, Pennsylvania. *Id.* at 141-42. The police obtained video surveillance footage from Sheetz, and identified Maurer entering a vehicle registered to McCreath, then exiting, and McCreath putting air in the tires. *Id.* at 142-43, 145-46, 148. Two days later, Maurer texted the 710 number and asked if he could send money via Venmo or Cash App; the response instructed Maurer to send money to easystreet248. *Id.* at 140-41.

---

[3] Relevantly, Detective Andrew Herr testified that Cook's address in Enola, Pennsylvania was known for drug transactions. N.T., 8/26/2025, at 153.

On July 3, 2019, the 710 number sent a message to Maurer stating, "blues are back" and emphasized "they legit blues … they strong." *Id.* 162; *see also id.* at 163. Maurer indicated he wanted five and organized a plan to meet at 907 Chester Road. *Id.* at 162. Maurer sent a message saying, "I'm here" and received a response from the 710 number to "come door." *Id.* About thirty-five minutes later, the 710 number texts Maurer asking, "are they still [flexing arm emoji indicating 'strong']?" to which Maurer replied, "actually yes." *Id.* Again, Maurer texted the 710 number and stated, "dude, those were crazy strong." *Id.* at 154. A response from that same number stated, "they'll go fast," and Maurer, in turn, responded, "put aside [three] for tomorrow." *Id.*

Maurer texted the 710 number on the morning of July 4, 2019, regarding a drug transaction. *Id.* at 156. Specifically, at 7:42 a.m., Maurer texted the 710 number that he would be working from 8:00 a.m. to 4:00 p.m. and asked when they could meet. *Id.* at 154. At 9:02 a.m. the 710 number replied with a location in Enola and Maurer responded that he would leave work to meet him. *Id.* at 155. Maurer texted the 710 number that he wanted two pills, stating "[t]hey just pack a punch bro where I cut them in half." *Id.* at 155-56. The 710 number responded, "ok got you." *Id.* at 156. At 10:09 a.m. Maurer texted the 710 number that he was "pulling up." *Id.* The 710 number

texted Maurer to "come in." *Id.*[4]  On July 8, 2019, Maurer's phone received a message from the 710 number asking if Maurer wanted "more blues?" *Id.* at 156.

Following an investigation, police arrested McCreath, and the Commonwealth charged him with the above-listed crimes.  The case proceeded to a bench trial.  Ultimately, the trial court found McCreath guilty on all three counts and sentenced McCreath to an aggregate term of ten to twenty years in prison.  McCreath filed a timely notice of appeal and a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b).

On appeal, McCreath raises the following question for our review: "Where there was insufficient evidence that [McCreath] gave a controlled substance to the decedent, was the evidence insufficient as a matter of law to prove either the charge of [DDRD] or the charge of delivery of a controlled substance?"  McCreath's Brief at 5 (unnecessary capitalization omitted).

McCreath challenges the sufficiency of the evidence to support his DDRD and delivery of a controlled substance convictions. *Id.* at 12.  He asserts that the evidence did not establish he delivered a controlled substance to Maurer. *Id.* at 12, 13, 20.  Although McCreath does not contest that Maurer died of

---

[4] Further, the Commonwealth presented evidence that at 7:52 a.m., Maurer's phone was at the Hershey Lodge. N.T., 8/26/2025, at 154-58.  When Maurer indicated he had arrived to buy the drugs, his phone was in Enola, near Cook's residence. *Id.* at 153, 155-56, 159.  The phone returned to Hershey Lodge at 10:36 a.m. *Id.* at 160.

fentanyl toxicity, he claims there was no evidence to establish that he delivered the fentanyl that caused Maurer's death. *Id.* at 14-15. McCreath acknowledges that video surveillance footage establishes he knew Maurer, but claims it is purely speculative that he sold drugs to Maurer. *Id.* at 16, 20. To that end, he argues that the surveillance video of the alleged drug transaction with Maurer occurred over a month before his death. *Id.* at 20. Additionally, McCreath emphasizes that Maurer was a longtime opioid user and could have purchased drugs from another drug dealer. *Id.* at 16-17; *see also id.* at 17 (noting Maurer had drug-related conversations with three different phone numbers). Based on the admitted text messages, McCreath claims there is nothing strongly suggesting he actually delivered drugs to Maurer. *Id.* at 18. Furthermore, the contents of the blue wax-paper bag found in Maurer's car are unknown and there is no DNA evidence identifying McCreath as the source of the bag. *Id.* at 19, 20-21.

Our Court's standard of review of a challenge to the sufficiency of the evidence is well settled:

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is de novo and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact[]finder to determine the weight to be accorded to each witness'[] testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of

proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact[]finder.

***Commonwealth v. Rosario***, 307 A.3d 759, 764-65 (Pa. Super. 2023) (citation omitted).

Pennsylvania law prohibits the delivery of controlled substances:

Except as authorized by this act, the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.

35 P.S. § 780-113(a)(30). Significantly, the Controlled Substance, Drug, Device and Cosmetic Act defines "deliver" and "delivery" as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, other drug, device or cosmetic whether or not there is an agency relationship." ***Id.*** § 780-102.

The Pennsylvania Crimes Code defines DDRD as follows:

A person commits a felony of the first degree if the person intentionally administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance in violation of section 13(a)(14) or (30) of the act of April 14, 1972 (P.L.233, No.64), known as The Controlled Substance, Drug, Device and Cosmetic Act, and another person dies as a result of using the substance.

18 Pa.C.S. § 2506(a). DDRD "consists of two principal elements: (i) intentionally administering, dispensing, delivering, giving, prescribing, selling or distributing any controlled substance or counterfeit controlled substance

and (ii) death caused by ('resulting from') the use of that drug." **Commonwealth v. Kakhankham**, 132 A.3d 986, 991-92 (Pa. Super. 2015) (footnote and brackets omitted). "[T]he applicable mens rea for the crime of drug delivery resulting in death is two-fold. First, the delivery, distribution or sale of the contraband must be intentional. Second, the actual death must be the reckless result of the actions of the defendant." **Commonwealth v. Burton**, 234 A.3d 824, 830 (Pa. Super. 2020) (citation omitted).[5] Intent can be proven by circumstantial evidence. **Commonwealth v. Campbell**, 253 A.3d 346, 348 (Pa. Super. 2021).[6]

_____

[5] We note that "[g]iven the inherent danger[s] of consuming fentanyl in an unknown strength and the high possibility that death could occur, the Commonwealth satisfies the reckless element as to the possibility of death when the substance involved is fentanyl." **Commonwealth v. Scott**, 325 A.3d 844, 850 (Pa. Super. 2024) (citation and quotation marks omitted). Here, McCreath concedes that Maurer's death was caused by the use of fentanyl. **See** McCreath's Brief at 14.

[6] DDRD also "requires 'but-for' causation such that the defendant's action with the drugs was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result, so long as the defendant's actions were not so extraordinarily remote or attenuated that it would be unfair to hold the defendant criminally responsible." **Scott**, 325 A.3d at 850 (citation and some quotation marks omitted). However, McCreath did not raise the issue of causation in his Rule 1925(b) concise statement; thus, the issue is waived. **See** Trial Court Opinion, 12/30/2025, at 2 (noting McCreath "framed his issues very narrowly" and did not challenge causation); **see also** Pa.R.A.P. 1925(b)(4)(vii) (noting issues not included in the concise statement are waived). Additionally, aside from a recitation of case law relating to causation, McCreath fails to set forth any reasoned argument claiming he was not the "but-for" cause of Maurer's death. **See** Pa.R.A.P. 2119(a) (stating the argument must include "such discussion and citation of authorities as are deemed pertinent").

Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, we conclude that the direct and circumstantial evidence presented was sufficient to prove that McCreath delivered the drugs to Maurer. The evidence established that Maurer had repeatedly texted phone numbers associated with McCreath to purchase drugs since February 2019 and made payments to the Cash App associated with McCreath's social security number, address, bank account, and cell phone numbers. On July 4, 2019, the day of Mauer's overdose, Maurer arranged to buy "blues" (fentanyl) from McCreath, told McCreath that the prior pills he bought from McCreath were strong and that he only sought two pills on that date, exchanged text messages with McCreath upon his arrival at the agreed upon location to facilitate the purchase of blues, and later died from fentanyl toxicity.

Although McCreath states Maurer bought drugs from other dealers, McCreath was the only person who had a drug-transaction-related conversation with Maurer in the hours leading up to his death and there was no evidence that he engaged in intervening drug purchases. *See* N.T., 8/26/2025, at 172-73 (Detective Herr testified that Maurer did not communicate with any other individuals in his phone with whom he conducted drug transactions regarding "whites" or heroin on July 3 or 4, 2019). Therefore, we conclude that the evidence is sufficient to establish McCreath delivered the drugs on July 4, 2019. *See Burton*, 234 A.3d at 830.

Accordingly, the evidence was sufficient to support McCreath's DDRD and delivery of a controlled substance convictions.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/14/2026